# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **AMANDA M. SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:12cv1400 RWS** |
| | ) | **TCM** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Amanda S. Sims for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b. Ms. Sims has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Amanda Sims (Plaintiff) applied for SSI in June 2009, alleging she was disabled as of January8, 1986, by seizures, back pain, irritable bowel syndrome (IBS), and severe migraines. (R.[1] at 120-26, 139.) Her application was denied initially and following a video

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

conference hearing held in June 2010 before Administrative Law Judge (ALJ) Janis Estrada. (Id. at 15-26, 30-65.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Byron J. Pettinghill,[2] M.R.C. (Master of Arts in Rehabilitation Counseling), C.R.C. (Certified Rehabilitation Counselor), testified at the administrative hearing.

Before any testimony was heard, Plaintiff's counsel amended her alleged onset date to be the date she filed her SSI application: June 22, 2009.  (Id. at 34.)

Plaintiff, twenty-three years old at the time of the hearing, testified that she is 5 feet 5 inches tall, weighs 145 pounds, and is right-handed.  (Id. at 35.)  She is recently married. (Id. at 37.)  She lives with her husband, who is receiving disability benefits based on mental impairments.  (Id. at 38.)  She has never worked.  (Id. at 39.)  She has never looked for a job, nor does she intend to after getting her General Equivalency Degree (GED).  (Id.)  They receive food stamps.  (Id. at 44.)

She had been home-schooled after the third grade and was tested to the twelfth grade. (Id. at 35-36.)  She does not have a high school diploma, but is studying to take the GED exam.  (Id. at 36-37.)  She has taken two of the five parts necessary to pass the exam and is working on the remaining three.  (Id. at 37.)

---

[2]Where there is an inconsistency between a proper name in the hearing transcript and in other records, the Court will employ the spelling that appears in the other records.  For instance, the vocational expert's last name is "Dettendena" in the transcript; however, his resume and the decision refer to his name as being "Pettinghill."

Plaintiff takes Epitol twice a day for seizures, nortriptyline twice a day for migraines, and NuLev for her IBS. (Id. at 39-40, 41.) The first two make her tired; consequently, on an average day, she takes at least one twenty to thirty minute nap. (Id. at 45.) The medications also interfere with her ability to concentrate. (Id.) Twice a month, she also uses a ProAir inhaler for her asthma. (Id. at 41.) When it is hot outside, she has five to six seizures a day. (Id. at 40.) When it is cool outside, she has three to four. (Id.) She also testified that she has an average of six or seven seizures at night during the week. (Id. at 46.) When she has a seizure at night, she relaxes and takes it easy the next day. (Id. at 47.) When she has a seizure, she bites her tongue or cheek. (Id. at 46.) She began taking the nortriptyline in October 2009. (Id. at 40.) She used to have migraines every day that would cause her to black out; with the nortriptyline, she no longer blacks out and her migraines are twice a week. (Id.) She has a migraine after she has a seizure. (Id. at 48.) A migraine will last two or three days. (Id.) She lies down with a towel or bandana over her eyes three to four times a day because of the migraines. (Id.)

Her husband makes sure she takes her medications. (Id. at 47.) She surrendered her driver's license when she was told by a doctor in the emergency room that she could not have one because of her seizures. (Id. at 42.)

Plaintiff reads books, preferably mysteries, and watches crime shows on television. (Id. at 42-43.) She keeps up with the news. (Id. at 43.) She enjoys crocheting. (Id. at 44.)

If Plaintiff is "not having a bunch of seizures throughout the day," she is able to function "pretty normally." (Id.) On a bad day, she is weak. (Id.) She has five or six good days in a month; the rest are bad. (Id. at 43-44.)

She does the laundry; she and her husband do the cooking and grocery shopping. (Id. at 44.) They go out to dinner once a month. (Id.)

She also has back problems after being in a few car accidents. (Id. at 49.) She has recently found out she has bone fragments in her back. (Id.) Her back problems do not limit her any more than she has previously described. (Id.) She is not taking any medication for the back pain. (Id.)

Mr. Pettinghill, testifying as a vocational expert, was asked by the ALJ to assume a hypothetical claimant of Plaintiff's limited education, e.g., no high school diploma or GED, and with no past relevant work. (Id. at 51.) This person has a seizure disorder, an irritable bowel condition, migraine headaches, and asthma, for all of which she is taking medication. (Id.) This person also has a history of back pain, for which she is not taking any medication. (Id.) She does not have any exertional limitations, but is unable to work in other than air-conditioned environments and can not work around moving or dangerous equipment and hazards, e.g., open fire or open water. (Id. at 51-52.) She also can not climb ropes, ladders, or scaffolds. (Id. at 52.) Asked if there are any jobs this hypothetical claimant can perform at the medium exertional level, Mr. Pettinghill replied that she could work as a food service worker, a grocer sacker, and a dining room attendant. (Id. at 52-53.) These jobs exist in significant numbers in the state and national economies. (Id.)

At the light exertional level, this claimant could work as a small products assembler, clothing sorter, and laundry folder. (Id. at 54.) These jobs also exist in significant numbers in the state and national economies. (Id.) At the sedentary level, this claimant could work as a final assembler, an order clerk, and a sorter. (Id.) These jobs exist in significant numbers in the state and national economies. (Id.)

If this claimant also needs to nap at least twice a day due to the side effects of her medication and will have "only six good days a month," there are no jobs she can perform. (Id. at 55.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and various assessments of her physical capabilities.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 138-46.) She was then 5 feet 4 inches tall and weighed 161 pounds. (Id. at 138.) The highest grade she has completed is the seventh grade. (Id. at 145.) She had not been in special education classes. (Id.)

Asked to describe on a Function Report what she does during the day, Plaintiff reported that she does the dishes, laundry, and "a little bit of exercise." (Id. at 153-60.) Her husband helps her do household chores when she does not feel well. (Id. at 154.) She would like to work, but cannot. (Id.) The only problem she has with personal care tasks is that her hands shake when she is trying to feed herself. (Id.) She prepares the meals, and does the

mowing and cleaning. (Id. at 155.) Once or twice a month, she goes shopping for no longer than two hours. (Id. at 156.) Her hobbies include reading, watching television, and crocheting. (Id. at 157.) On a regular basis, she goes to the movies or out to dinner. (Id.) Her impairments adversely affect her abilities to lift, bend, stand, reach, walk, sit, kneel, remember, concentrate, and climb stairs. (Id. at 158.) They do not affect her abilities to, among other things, squat or complete tasks. (Id.) She can walk for approximately three miles before having to stop and rest for twenty minutes. (Id.) She cannot pay attention for longer than thirty minutes. (Id.) She follows written instructions well and spoken ones "great." (Id.) She gets along well with authority figures. (Id. at 159.) She does not handle stress well, but does handle changes in routine okay. (Id.)

Plaintiff's husband completed a third-party Function Report on her behalf. (Id. at 176-83.) His answers generally mirrored those of Plaintiff's, with the exceptions of including squatting on the list of abilities adversely affected by her impairments and limiting the distance she can walk before having to rest to two miles. (Id. at 161.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application. (Id. at 187-93.) Since she had completed the initial report, her migraines and back problems were worse. (Id. at 188.)

The relevant medical records before the ALJ are summarized below in chronological order, beginning with the January 3, 2006, office notes of Anthony G. Giatras, M.D., a neurologist, who Plaintiff consulted about her headaches. (Id. at 204-06.) She reported having an increase in headaches since she began taking Topamax, a seizure medication used

to prevent migraine headaches in adults.[3] (Id. at 204.) She was having migraines three to four times a week that required she take Fioricet[4] and Relpax[5]; and, she was not sleeping well. (Id.) Her problems included IBS, depression, and anxiety. (Id.) She had gained weight; she weighed 122 pounds. (Id. at 204, 205.) She was engaged and worked part-time at a Marine base. (Id. at 205.) Her family history included a father who was 44 years old and had hypertension, migraines, and obesity. (Id.) Her neurological, motor, and sensory examinations were normal. (Id. at 206.) Her medications included phenergan, Fioricet with codeine, Ortho Tri-Cyclen (a contraceptive), Relpax, Zyrtec (for allergies), Donnatal Elixir (for IBS[6]), and NuLev. (Id. at 205.) She was to discontinue the Topamax and begin taking folic acid, Zonegran,[7] and Toradol, a nonsteroidal anti-inflammatory.[8] (Id.)

At a follow-up visit with Dr. Giatras the following month, Plaintiff reported that she had had several headaches since the last visit, but they were primarily due to a sinus infection and stress. (Id. at 207-09.) Her mother reported that Plaintiff had been having episodes

---

[3]See Topamax, http://www.drugs.com/search.php?searchterm=Topamax (last visited July 10, 2013).

[4]Fioricet is a combination of acetaminophen, caffeine, and butalbital (a barbiturate) used to treat tension headaches. See Fioricet, http://www.drugs.com/fioricet.html (last visited July 12, 2013).

[5]Relpax is used to treat migraine headaches, but does not prevent them or reduce them in number. See Relpax, http://www.drugs.com/relpax.html (last visited July 12, 2013).

[6]See Physicians' Desk Reference, 2778 (65th ed. 2011) (PDR).

[7]Zonegran, a sulfa drug, is used with other anti-convulsant medications to treat partial seizures in adults with epilepsy. See Zonegran, http://www.drugs.com/mtm/zonegran.html (last visited July 12, 2013).

[8]See Toradol, http://www.drugs.com/search.php?searchterm=Toradol (last visited July 10, 2013).

where she will start staring and become unresponsive, even when talking with someone. (Id. at 207.) She does not lose consciousness. (Id.) She was continued on her current medications. (Id. at 209.)

Three days later, on February 9, Plaintiff informed her primary care physician, Julianna Raymaker, M.D., that her neurologist had placed her on Zonegran as a prophylaxis for her migraines. (Id. at 283-84.)

A February 21 electroencephalogram (EEG) performed when Plaintiff was in waking, drowsing, and spontaneously sleeping states was normal. (Id. at 211.)

Plaintiff consulted Dr. Raymaker again on September 13, complaining of mid and low back pain. (Id. at 281-82.) Also, she requested some medication for depression because her husband of seven months was leaving her. (Id. at 281.) She was not extremely emotional, but felt that an anti-depressant would be helpful. (Id.) Her mother had multiple chronic illnesses; her father was unknown to her. (Id.) On examination, her gait was normal; her straight leg raises were negative[9]; a Fabere's sign, or Patrick's sign, was absent.[10] (Id.) She was diagnosed with IBS, lumbar strain, and depression. (Id.) For the lumbar strain, she was

_____

[9]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[10]A positive Patrick's sign indicates the presence of sacroiliac joint dysfunction in patients with lower back pain. Patrick's Test: Evaluation of Sacroiliac Joint Dysfunction, http://stemcelldoc.wordpress.com/2009/03/30/patricks-test-evaluation-of-sacroiliac-joint-dysfuncti on/test (last visited July 12, 2013). It is also referred to as the Fabere's sign. See Dorland's Illustrated Medical Dictionary, 1896 (32nd ed. 2012) (Dorland's). The word "Fabere" is derived from "the initial letters of the movements necessary to elicit [the sign]: flexion, abduction, external rotation, extension." Id.

given exercises, told to do gentle stretches, and prescribed Naproxen for discomfort.  (Id.)
She was prescribed NuLev for the IBS and a low dose of Zoloft for depression.  (Id.)

Two weeks later, Plaintiff explained to Dr. Raymaker that she had been living in
another town, was having back pain, and, after a magnetic resonance imaging (MRI) of her
spine was performed, was found to have a "'bone chip' somewhere in her back."  (Id. at 279-
80.)  Dr. Raymaker noted that Plaintiff had told her nurse she was having pain that was a ten
on a ten-point scale, but was observed sitting very comfortably in a chair, moving around the
room quickly, sitting up on the table without a problem or concern, and being happy and
talkative.  (Id. at 279.)  On examination, Plaintiff could flex and extend her back without a
problem, had a good range of motion, had no problems with her gait, and had full strength
in both her upper and lower extremities.  (Id.)  She was diagnosed with thoracic and lumbar
pain.  (Id.)  She was to get x-rays done, get a copy of the MRI results, and return in one
month.  (Id.)

Plaintiff complained to Dr. Raymaker in October of intermittent low back pain and
requested a refill of Imitrex for migraines and a new prescription for Zoloft for depression.
She described the depression as intermittent and, currently, "not particularly bad."  (Id. at
277-78.)  She had not had the x-ray done as Dr. Raymaker had requested, and had not been
able to get the MRI results as requested. (Id.)  The results of an examination were normal.
(Id.)  She was given the requested prescriptions, and was to return in two months.  (Id.)

Plaintiff returned in one month, telling Dr. Raymaker on November 29 that she had
had no migraines since Thanksgiving six days earlier, and only three in last six months.  (Id.

at 275-76.)  She had stopped taking Zonegran and Requip (for restless leg syndrome[11]), and was taking only Ortho Tri-Cyclen, Imitrex, and Zoloft.  (Id. at 275.)  The latter was not helping with her depression as much as she would like.  (Id.)  She wanted to try Cymbalta, which had helped her mother.  (Id.)  Dr. Raymaker prescribed Plaintiff an azithroymcin Z-Pak for the cough and congestion caused by her bronchitis and Cymbalta for her depression. (Id.)

Plaintiff next saw Dr. Raymaker in January 2007.  (Id. at 272-74.)  The visit was for a gynecological concern.  (Id.)  Her past medical history included depression and migraines. (Id.)

In February, Plaintiff complained to Dr. Raymaker of chest pain with deep breaths. (Id. at 225-27.)  She reported that the pain was getting better.  (Id. at 225.)  She was to return in one week. (Id. at 227.)

At the next visit, Dr. Raymaker prescribed Zyrtec for Plaintiff's sinus congestion and cough.  (Id. at 269-71.)  The only diagnosis checked was sinusitis.  (Id. at 271.)  She weighed 159 pounds.  (Id. at 269.)

In April, Plaintiff complained of sinus problems for the past week.  (Id. at 266-68.) On a checklist of diagnoses, depression was checked; anxiety with depression was not checked.  (Id. at 268.)

In May, Plaintiff saw Dr. Raymaker about her low back pain.  (Id. at 263-65.)  The only prescription was for her contraceptive.  (Id. at 265.)

---

[11]See PDR at 1529.

Plaintiff consulted Dr. Raymaker in June about, among other things, sinus and sleeping problems. (Id. at 260-63.) Ambien was added to her medications. (Id. at 262.)

In July, Plaintiff's complaints were of fatigue and bronchitis. (Id. at 257-59.) The only diagnosis checked was bronchitis. (Id. at 259.)

In August, Plaintiff reported having pain in her right side; the pain was worse when she took deep breaths. (Id. at 254-56.) She was having more headaches and was more anxious. (Id. at 255.) Dr. Raymaker referred Plaintiff to Dr. Giatras for treatment of her headaches and increased her dosage of Prozac.[12] (Id. at 256.)

Plaintiff informed Dr. Raymaker in September that her headaches were resolved and her depression was better with the increased dosage of Prozac. (Id. at 249-52.) She was happy and laughing. (Id. at 249.) Her diagnoses were anxiety, depression, and IBS. (Id. at 251.) She was continued on her current medications, which then also included Flexeril for her back pain, Ambien for insomnia, ProAir for bronchitis, Prozac, and Donnatal and NuLev for her IBS. (Id. at 251-52.)

Plaintiff next saw Dr. Raymaker in December for her IBS and complaints of occasional diarrhea and constipation. (Id. at 237-39.) Plaintiff was taking Donnatal and NuLev. (Id. at 237.) She was instructed to drink more water and not drink soda, use Splenda, or eat fried foods or chips. (Id. at 239.) She was to follow-up in one month or sooner if her conditions were worse. (Id.)

---

[12]Prozac is prescribed for the treatment of major depressive disorder. *Id.* at 1816. The Court could not locate a previous record of Plaintiff having previously been prescribed Prozac.

The next time Plaintiff sought medical attention was in February 2008 when she went to the emergency room at Phoebe Putney Memorial Hospital[13] for a dry, unproductive cough that had begun a week earlier. (Id. at 330-39.) She reported that Dr. Raymaker had diagnosed her with bronchitis three days earlier, but she could not get the prescription filled because she did not have any money. (Id. at 334.) She was at the emergency room to get the medication. (Id.) She was described as single and attending school. (Id.) She was diagnosed with acute bronchitis and prescribed hydrocodone, doxycycline (an antibiotic), and prednisone. (Id. at 335.) She was to follow up with Dr. Raymaker in three to five days, or earlier if her symptoms worsened. (Id. at 336.)

Plaintiff did not see Dr. Raymaker until June, when she consulted her about occasional right thigh numbness for the past two weeks. (Id. at 219-21.) The numbness was relieved by sitting. (Id. at 219.) She had started working in April at "Extreme Wings" for eight to ten hours a day, five days a week. (Id.) On examination, she had normal sensitivity to a light touch. (Id. at 220.) Plaintiff was to have an x-ray of her lumbar spine and was referred to physical therapy. (Id. at 221.) The x-ray of her lumbar spine was normal. (Id. at 327-29.)

Plaintiff explained to the physical therapist that she was able to attend therapy sessions only once a week due to her work schedule. (Id. at 303-26.) She also explained that an MRI taken at a Veterans Administration facility showed a "fragment" at, as far as she could recall, L5-S1. (Id. at 321.) She did not have a copy of the report. (Id.) At the June 30 session,

---

[13]This hospital is in Georgia, as are Drs. Giatras and Raymaker. The first time Plaintiff sought medical attention in Missouri is in July 2009.

Plaintiff rated her pain as an eight. (<u>Id.</u> at 313.) At her last visit, she rated the pain as a two on a ten-point scale. (<u>Id.</u> at 303.) She was "overall feeling better." (<u>Id.</u>)

When seeing Plaintiff later in June for a swollen jaw following the removal of her wisdom teeth, Dr. Raymaker noted that she had been going to physical therapy for her low back problems, which had been resolved. (<u>Id.</u> at 216.)

The next medical record is from Missouri and is one year after Plaintiff last sought medical attention. Specifically, on July 6, 2009, Plaintiff went to Alyssa Keller, M.D., at the Family Medicine Clinic. (<u>Id.</u> at 379-82.) Plaintiff reported that she had had some relief when taking Depakote for her seizures, but she had been instructed in October 2008 to stop taking it because she would drive places and not remember. (<u>Id.</u>) After she stopped taking the medication, she initially noted that her seizures had stopped. (<u>Id.</u>) The frequency of the seizures was increasing with the warmer weather. (<u>Id.</u>) Her husband described Plaintiff's seizures as nocturnal, occurring two to three times a week and lasting approximately five minutes. (<u>Id.</u>) During a seizure, Plaintiff will clench her hands, legs, and arms. (<u>Id.</u>) They are accompanied by biting of the tongue and, occasionally, incontinence. (<u>Id.</u>) Plaintiff also has a history of severe migraines. (<u>Id.</u>) They are frequent. (<u>Id.</u>) Indeed, she had had a migraine every day that week. (<u>Id.</u>) They are accompanied by nausea and sensitivity to light and sounds. (<u>Id.</u>) They are triggered by Nutrisweet, Splenda, and strong odors. (<u>Id.</u>) She sometimes loses consciousness because of the pain. (<u>Id.</u>) Her asthma is controlled by albuterol. (<u>Id.</u> at 380.) Also, she has joint pain in both her knees, frequently has bronchitis, has chronic otitis media, and has had two miscarriages. (<u>Id.</u>) On examination, her systems

were normal, including her musculoskeletal, psychiatric, and neurologic systems.  (Id. at 381.)  She was reportedly five months pregnant and, consequently, had stopped taking her seizure and migraine medications.  (Id.)  Two days later, a blood test confirmed that Plaintiff was not pregnant.  (Id. at 382-85.)  She was advised to follow-up with her neurologist for control of her seizures and migraines.  (Id. at 382.)

Plaintiff was taken by ambulance on July 13 to the emergency room at the University Hospital.  (Id. at 407-10, 414.)  The circumstances are described as follows.

> The patient . . . presents with seizure.  The occurrence was witnessed.  The course is resolved.  Prior neurologic deficits:  negative.  Seizure type:  eyes rolled back in head.  Per EMS report patient began having eye rolling episode and when they told her to stop, she complied.  Started crying and stated she wanted people to pay attention to her when EMS asked why she was having seizures.

(Id. at 407-08.)  An examination revealed no problems.  (Id. at 409.)  A computed tomography (CT) scan of her head was normal.  (Id. at 414.)  Plaintiff was instructed to follow-up with Dr. Lanigar as scheduled. (Id. at 410.)

Plaintiff saw the neurologist, Sean E. Lanigar, M.D., on July 21.  (Id. at 396-99.)  Her neurological, cranial nerve, motor, sensory, cerebellar, and gait exams were all normal.  (Id. at 397.)  Dr. Lanigar thought she should be on medication.  (Id. at 398.)  He started her on twenty-five milligrams of Lamictal once a day with an increase over the next eight weeks to one hundred milligrams.  (Id.)  She was to return in three to four months.  (Id.)  She was also advised that she had to be seizure free for six months in order to drive.  (Id.)

Plaintiff went to the emergency room at University of Missouri Hospital on July 27 with complaints of weakness and numbness in her right arm and face.  (Id. at 366-78.)  She

explained that she might have had a seizure at 3 o'clock that morning, had awaken with the described symptoms, and had, after eighteen hours, decided to go to the emergency room. (Id. at 367.) She reported having a history of seizures, although none had previously been accompanied by the current symptoms. (Id.) She had not filled the prescription for KEPPRA[14] given her by Dr. Laniger for her seizures because of the cost. (Id. at 372.) She had had between two and three seizures between October 2008 and May 2009. (Id.) During the past month and a half, she had had "a couple" of seizures, causing her to shake, bite her tongue, lose consciousness, and "have rolling eyes." (Id.) These seizures lasted for five to six minutes and were followed by a period of confusion. (Id.) Before the seizures, she would have aura symptoms, headaches, and mental confusion. (Id. at 372-73.) Her last seizure was on July 12. (Id. at 373.) She was a full-time GED student. (Id.) On examination, her systems were normal. (Id. at 374.) When engaged in conversation, she laughed and had no observable facial weakness. (Id.) "[S]he mentioned during the interview that she needs to get disability that she applied for." (Id.) The physician thought she might have "some malingering issue or . . . conversion disorder." (Id.) She did not have any acute neurological symptoms. (Id.) It was thought that her seizures were "likely psychogenic."[15] (Id. at 370.) A review of all her systems was negative with the exception of the neurologic

---

[14]KEPPRA, like Lamictal, is an antiepilectic drug. See PDR at 1437, 3255. The Court could find no reference in the record to the prescription being changed. The change, however, is apparently immaterial.

[15]A psychogenic seizure is not an epileptic seizure and is thought to be psychological in origin. See Selim R. Benbadis M.D. Psychogenic Nonepileptic Seizures, http://emedicine.medscape.com/article/1184694-overview (last visited July 15, 2013).

- 15 -

weakness and numbness.  (Id. at 368.)  A CT scan of her head was normal.  (Id. at 378, 404-05.)  She was discharged with instructions to see Dr. Lanigar.  (Id. at 374-75.)

When having an EEG on August 25, Plaintiff reported that her last seizure was in January 2009.  (Id. at 393-94.)  The EEG was normal.  (Id. at 393.)  An MRI taken the same day of her brain was also normal.  (Id. at 402-03.)

Also before the ALJ were various assessments of the causes of Plaintiff's impairments and their resulting limitations.

In September 2009, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Terri Helming, a single decision-maker.[16]  (Id. at 416-21.)  The primary diagnosis was a history of seizures; the secondary diagnosis was a history of migraines; other alleged impairments were a history of IBS and of back pain.  (Id. at 416.)  She had no exertional, manipulative, visual, or communicative limitations.  (Id. at 417-19.)  She had a postural limitation of only occasionally climbing ladders, ropes, or scaffolds and environmental limitations of needing to avoid concentrated exposure to extreme heat and avoid even moderate exposure to workplace hazards.  (Id. at 418, 419.)

Dr. Lanigar twice wrote "To Whom It May Concern."  (Id. at 422, 424.)

He wrote in November 2009 that Plaintiff was thought to have complex partial seizures originating in the frontal lobe.  (Id. at 422.)  He had last seen her in October.  (Id.)  She had "almost nightly seizures" and migraine headaches.  (Id.)  Amitriptyline helped with

---

[16]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

the migraines.  (Id.)  She had "about 3-4 headaches per month."  (Id.)  She was on carbamazepine for her seizures.  (Id.)

The other letter is dated April 2009, but refers to a previous examination of Plaintiff in October 2009.  (Id. at 424.)  Dr. Lanigar noted that patients with epilepsy have a normal EEG fifty-five to sixty percent of the time.  (Id.)  He also noted that Plaintiff had been doing "relatively well" when he saw her in October; her nighttime convulsions appeared to be controlled by carbamazepine and her daytime general convulsions "had not occurred in a while."  (Id.)  He did not know how she had been doing since October since she had "missed multiple appointments in the interim."  (Id.)

Also before the ALJ were Plaintiff's school records from kindergarten to second grade. (Id. at 416-45.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 22, 2009.  (Id. at 20.)  She next found that Plaintiff had severe impairments of a seizure disorder, headaches, asthma, and IBS.  (Id.)  Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level, including Listing 11.02 for epilepsy.  (Id. at 21.)  Nor did Plaintiff have any exertional limitations.  (Id. at 22.)  She did, however, have nonexertional limitations of being precluded from climbing ladders, ropes, or scaffolds; from operating dangerous or moving machinery; and from working around heights and in a hazardous work setting.  (Id.)  Also, she could only work in a climate-controlled work environment.  (Id.)

When assessing her RFC, the ALJ evaluated Plaintiff's credibility. (Id. at 23-24.) She found Plaintiff's descriptions of her limitations not to be entirely credible because (a) they were contradicted by her daily activities, which were more extensive than expected from her description of disabling symptoms and limitations; (b) Plaintiff had failed to follow-up on recommendations made by her treating physicians; (c) Plaintiff had failed to keep appointments; (d) there were gaps in her course of treatment; (e) her symptoms were generally controllable by medications; (f) there were suggestions in the record that she was malingering; and (g) there was a lack of restrictions placed on her by her doctors, and restrictions would be expected based on her allegations. (Id.)

Plaintiff had no past relevant work. (Id. at 25.) With her age, limited education, and RFC, there were jobs she could perform, as outlined by the VE. (Id. at 25-26.)

Plaintiff was not disabled within the meaning of the Act. (Id. at 26.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work

- 18 -

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523. "[RFC] is not the ability

merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to any past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as

adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u> <u>v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## <u>Discussion</u>

Plaintiff argues that the ALJ erred by not finding she satisfies Listing 11.02. The burden is on Plaintiff to prove that her epilepsy satisfies this Listing. <u>See</u> **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010).

Listing 11.02 provides:

Epilepsy-major motor seizures, (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (emphasis removed).

In support of her argument that she has established that she satisfies this Listing, Plaintiff cites, and relies on, the November 2009 letter of Dr. Lanigar, her neurologist. Dr. Laniger then wrote that Plaintiff had "almost nightly seizures" and was on carbamazepine for her seizures. (R. at 422.)

"The opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record." **Dipple v. Astrue**, 601 F.3d 833, 836 (8th Cir. 2010); accord **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009). However, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). See also 20 C.F.R. § 416.927(d)[17] (listing six factors to be evaluated

_____

[17]Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2010 version of the Regulations in effect when the ALJ rendered his adverse decision. The Regulations's most recent amendment, effective March 26, 2012, reorganizes the relevant subparagraphs but does not change their substance.

when weighing opinions of treating physicians, including supportability and consistency). And, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or when it consists of conclusory statements, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Plaintiff's reliance on Dr. Lanigar's letter to establish that she satisfies Listing 11.02 fails for two reasons. First, neither his letter nor the other evidence in the record satisfies the criteria in the introductory paragraph of Listing 11.02 that her seizures follow a typical seizure pattern and occur more frequently than once a month "in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02. "'To meet a listing, an impairment must meet all of the listing's specified criteria.'" **Carlson**, 604 F.3d at 593 (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)).

There is no record of Plaintiff seeking medical attention, including having any medications prescribed, between June 2008 and July 2009. When she did at last seek such attention, she informed a family practitioner that she was experiencing nocturnal seizures two to three times a week. She also informed the practitioner that she had not been taking any seizure medication because of a suspected pregnancy. Plaintiff was not pregnant. Nor was she prescribed any seizure medication until seeing Dr. Lanigar three weeks later for the first

time. When seen at the emergency room six days later, she had not had the prescription filled because of the cost. There is no evidence, however, that she was denied the medication after telling Dr. Lanigar, or any other health care provider, that she could not afford the prescription. See **Johnson v. Bowen**, 866 F.2d 274, 275 (8th Cir. 1989) (rejecting claimant's argument that his failure to take prescribed medication should be excused because he could not afford it in case in which there was no evidence that claimant had told his physician he was unable to afford the medication). She also reported at that visit that she had had "a couple" of seizures during the past six weeks. (R. at 372.) The November 2009 letter by Dr. Lanigar refers to Plaintiff having "almost nightly seizures." (Id. at 422.) It also refers to a visit the previous month – the records of which were not before the ALJ – and to a medication Plaintiff was on for her seizures. The other letter, clearly written in April *2010*, see page 17, supra, also cites this October visit as the last time Dr. Lanigar saw Plaintiff. Thus, the record before the ALJ does *not* establish that Plaintiff had seizures for a period of three months in spite of at least three months of prescribed treatment. Indeed, there is no record of Plaintiff ever following a course of prescribed treatment for at least three months.

Second, the reference in Dr. Lanigar's letter to the frequency of Plaintiff's seizures clearly relies on her report of such.[18] An ALJ does not err by not giving a treating physician's opinion controlling weight when that opinion is, as in the instant case, "largely based on the

_____

[18]The Court notes that Plaintiff does not challenge the ALJ's adverse credibility determination. Were she to do so, the challenge would be unavailing for the reasons set forth by the Commissioner.

[claimant's] subjective complaints." **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012).

Plaintiff contends that the ALJ's failure to mention Dr. Lanigar's November 2009 indicates that she did not consider it. Under this logic, a mention of the letter means that she did consider it. The ALJ cites the letter, designated as Exhibit 9F, twice. Once is in the context of the ALJ's finding that Plaintiff's seizure disorder is treated with medication. (<u>See</u> R. at 20.) This is an accurate citation. The second time is in the context of there being no restrictions on Plaintiff, with the exception of not driving. (<u>See</u> <u>id.</u> at 24.) This also is accurate. A more thorough discussion of Dr. Lanigar's letter is not required as it would not have any effect on the decision. <u>See</u> **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) ("[A]n arguable deficiency in opinion-writing technique does not require [the Court] to set aside an administrative finding when that deficiency had no bearing on the outcome.") (internal quotations omitted).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964. Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this  16th  day of July, 2013.